1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND

2

     UNITED STATES OF AMERICA     :

3

              PLAINTIFF  :      CRIMINAL

4

         VS.            :      DOCKET

5

     WILHELMINA ANDERSON        :       L-00-033

6

              DEFENDANT   :

7               - - - - - - - - - -

8                          BALTIMORE, MARYLAND

9                          AUGUST 20TH, 2001

10

11        THE ABOVE ENTITLED MATTER CAME ON FOR SENTENCING IN

12     THE UNITED STATES DISTRICT COURT BEFORE THE HONORABLE BENSON

13     EVERETT LEGG, BEGINNING AT 9:40 O'CLOCK A.M..

14

15                  APPEARANCES

16     FOR THE GOVERNMENT:

17          MARTIN CLARKE, ESQUIRE

18

19     FOR THE DEFENDANT:

20          DONALD H. FEIGE, ESQUIRE

21
            REPORTED BY:-
22           E. EDWARD RICHARDSON
            OFFICIAL COURT REPORTER
23           3012 UNITED STATES COURTHOUSE
            101 WEST LOMBARD STREET
24           BALTIMORE, MARYLAND 21201
            (410) 539-0034
25

2

1           PROCEEDINGS

2        THE COURT:  GOOD MORNING.  PLEASE BE SEATED.  MR.

3   CLARKE, IF YOU WOULD CALL THE CASE, PLEASE.

4         MR. CLARKE:  YES, YOUR HONOR.  THIS IS THE

5   MATTER OF THE UNITED STATES OF AMERICA VERSUS WILHELMINA

6   ANDERSON, CRIMINAL NO. L-00-033.

7         MARTY CLARKE ON BEHALF OF THE GOVERNMENT.  WE ARE

8   HERE FOR SENTENCING.

9        THE COURT:  THANK YOU.  AND, AS THE RECORD WILL

10   SHOW, MR. FEIGE IS HERE ON BEHALF OF MS. ANDERSON, AND MS.

11   ANDERSON IS HERE AS WELL.  GOOD MORNING.

12         MR. FEIGE:  GOOD MORNING, YOUR HONOR.

13         THE COURT:  I HAVE THE PRESENTENCE REPORT AND I

14   THANK OUR PROBATION OFFICER FOR HAVING PREPARED IT.  AS I

15   UNDERSTAND IT, THERE ARE THREE ISSUES THAT REQUIRE DECISION.

16          THE FIRST IS MS. ANDERSON'S ROLE IN THE OFFENSE.

17   IF SHE PLAYED A MANAGERIAL ROLE, THEN SHE IS NOT ELIGIBLE FOR

18   THE SAFETY VALVE.

19          IF SHE PLAYED NO MANAGERIAL ROLE, THEN SHE MAY BE

20   ELIGIBLE FOR THE SAFETY VALVE, AND SHE MAY ALSO BE ELIGIBLE

21    FOR A DOWNWARD ADJUSTMENT BECAUSE OF A MINIMAL OR MINOR
ROLE.

22        THE SECOND ISSUE RAISED BY MR. FEIGE IN HIS PAPERS

23    HAS TO DO WITH THE QUANTITY OF THE DRUGS TO BE ATTRIBUTABLE

24    TO MS. ANDERSON.

25        AND THEN THE THIRD ISSUE HAS TO DO WITH THE

3

1    DOWNWARD DEPARTURE UNDER THE POSTERS CASE.

2          MR. CLARKE, ARE THERE ANY OTHER ISSUES?

3          MR. CLARKE:  NO, YOUR HONOR THERE ARE NOT.

4          THE COURT:  THANK YOU.  MR. FEIGE?

5          MR. FEIGE:  YES, YOUR HONOR, I BELIEVE ALSO I

6    RAISED HEALTH.

7          THE COURT:  HEALTH.  YES, I AM SORRY.

8          MR. FEIGE:  AND, IN PASSING, IN MY PAPERS I DID

9    MENTION ACCEPTANCE OF RESPONSIBILITY, BUT I DON'T THINK WE

10   NEED MUCH OF A HEARING ON THAT.

11          AND ALSO I THINK, AS TO THE QUANTITY, I THINK THE

12   COURT ALREADY DECIDED THAT MORE OR LESS IN THE OTHER

13   HEARINGS.

14          THE COURT:  THAT IS TRUE, BUT I DID WANT TO GIVE YOU

15   AN OPPORTUNITY TO ADDRESS ANYTHING THAT I MAY HAVE

16   OVERLOOKED.  IF I COULD HAVE ONE SECOND.

17               (PAUSE)

18          THE COURT:  BECAUSE THE GOVERNMENT IS CONTENDING FOR

19   AN UPWARD ADJUSTMENT BASED UPON ROLE, I WOULD LIKE TO HEAR

20   FROM MR. CLARKE FIRST, PLEASE, IF YOU WOULD.

21          MR. CLARKE:  YOUR HONOR, AS THE COURT KNOWS, THE

22     GOVERNMENT HAS FILED A RATHER DETAILED SENTENCING
MEMORANDUM.

23     ON PAGE 24 OF THAT MEMORANDUM, WE GO INTO THE DETAILS OF
WHY

24     WE BELIEVE THE DEFENDANT SHOULD RECEIVE THE THREE LEVEL

25     UPWARD ADJUSTMENT FOR MANAGER OR SUPERVISOR.

4

1          IN MS. ANDERSON'S CASE, WE HAVE A GREAT DEAL OF

2      EVIDENCE THAT SHE WAS MORE THAN JUST A STORE CLERK OR JUST

3      INVOLVED BECAUSE IT WAS A FAMILY BUSINESS.  WE HAVE TESTIMONY

4      FROM NUMEROUS INDIVIDUALS, INCLUDING HER OWN SON, AARON

5      ANDERSON, HER -- I THINK IT'S HER NEPHEW, JOHN TRIPLINE, AND

6      OTHERS WHO CLEARLY ESTABLISHED THAT SHE WAS THE ONE PRIMARILY

7      RESPONSIBLE FOR STARTING TWO OF THE SATELLITE STORES, THOSE

8      BEING MENA T'S AND BAD BOYZ.

9          DAVID LYNCH TESTIFIED THAT HE WAS HIRED BY HER AND

10     THAT HE WORKED IN THE STORE UNDER HER SUPERVISION ALONG WITH

11     BIG E, STEVE, DEE, FUZZ, AND THREE OTHER EMPLOYEES.

12         AT THAT SINGLE STORE ALONE, YOUR HONOR, WE HAVE THE

13     REQUISITE NUMBER OF PEOPLE UNDER HER SUPERVISION.

14         I THINK MR. FEIGE WOULD TESTIFY THAT THERE IS SOME

15     TESTIMONY ABOUT MR. E AND HOW SORT OF A LOOSE KIND OF

16     MANAGEMENT STYLE AND MS. ANDERSON WASN'T ALWAYS THERE AND A

17     LOT OF THOSE THINGS ARE TRUE BUT THE COURT HAS HEARD THE

18     TESTIMONY OF THE WAY ALL OF THESE STORES ARE RELATED TO

EACH

19    OTHER AND HOW THE BUSINESS STRATEGY INTERLOCKS WITH EACH

20    OTHER AND HOW THEY SUPPLIED EACH OTHER AND HOW THEY WOULD

21    ROTATE AMONG THE STORES, SO I DON'T THINK THE FACT THAT SHE

22    WAS THERE INFREQUENTLY IN TERMS OF BEING A HANDS ON MANAGER

23    IS DISPOSITIVE.

24        WE WOULD NOTE THAT IN HER ROLE AS ONE OF THE

25    LEADERS IN THE BUSINESS, SHE IS THE ONE WHO FILED A MAJORITY

5

1    OF THE ARTICLES OF INCORPORATION, SHE WAS VERY INVOLVED IN

2    ORDERING LARGE QUANTITIES OF GELATIN CAPSULES THROUGH FAX

3    COMMUNICATIONS WITH CAPS AND GEL COMPANY IN 1998 AND 1999.

4          GEORGE WILLIAMS TESTIFIED THAT SHE IS THE ONE WHO

5    HIRED HIM TO WORK AT 1816 ACROSS THE STREET BEFORE HE MOVED

6    OVER TO THE ODD SIDE OF THAT BLOCK.  SHE IS THE ONE WHO

7    SUPERVISED HIM AT 1831.  SHE IS THE ONE WHO OCCASIONALLY

8    SUPERVISED BUSINESS AT 1821.

9          BUT PROBABLY MOST PERSUASIVE IN THIS CASE IS THAT

10    SPECIAL AGENT YIANNOS, IN HIS UNDERCOVER CAPACITY, HAD A

11    CHANCE TO SEE WILHELMINA ANDERSON AND NOTE FIRSTHAND THE WAY

12    SHE SORT OF DOMINATED THE PEOPLE THAT WORKED AT THE STORES,

13    THREATENING TO FIRE PEOPLE, GETTING THE KEYS FROM BEHIND THE

14    COUNTER, AND, VERY IMPORTANTLY, AFTER SHE PLEAD GUILTY IN THE

15    CIRCUIT COURT FOR BALTIMORE CITY, AND WE ALL SAW THE TAPE OF

16    THAT GUILTY PLEA AND HER SENTENCING IN FRONT OF JUDGE

17    MCCURDY, I BELIEVE IT WAS, WHERE HE ADVISED HER, YOU KNOW,

18    SPECIFICALLY THAT HE BELIEVED THAT SHE HAD ABSOLUTE KNOWLEDGE

19    WHAT ALL OF THESE PRODUCTS WERE BEING USED FOR FOR ALL OF

20    THOSE YEARS, AND SHE EXPRESSED THAT SHE DID NOT.

21        SUBSEQUENT TO THAT DATE WE NOTE FROM SPECIAL AGENT

22    YIANNOS THAT THEY MET AGAIN, THAT THEY ORDERED MORE PRODUCTS,

23    AND WE ARE TALKING THE CHEMICAL DILUENTS, FOR THE MINI-MART

24    AND SUBSEQUENT TO THAT DATE SHE WAS ORDERING MORE CAPSULES

25    FROM CAPSUGEL.

6

1        WE ALSO KNOW ABOUT THE WAY SHE HANDLED THE RAID AT

2     THE STORE AT MENA T'S WHEN OFFICER BROWN CAME AND SHE JUST

3     ARRIVED ON THE SCENE AND TOOK OVER THE ENTIRE EPISODE, AND

4     CHASTISED HER EMPLOYEES FOR CALLING THE POLICE IN THE FIRST

5     PLACE AND THEN YOU WILL RECALL THAT, WHEN SHE GAVE A

6     STATEMENT, SHE ADMITTED THAT SHE, AND THESE ARE HER WORDS,

7     THAT SHE WAS RESPONSIBLE FOR THE PEOPLE THAT WORKED FOR HER,

8     SHE IS THE ONE WHO HIRED THEM, THERE WAS ANOTHER MANAGER

9     BENEATH HER THAT WAS NOT THERE THAT DAY, EARL WATSON, SO,

10     YOUR HONOR, HER LEADERSHIP, HER SUPERVISORY ROLE IN THIS

11     ENTERPRISE, I BELIEVE, IS QUITE CLEAR.  MUCH CLEARER THAN

12     WILHELMINA ANDERSON OR PERHAPS EVEN JOHN TRIPLINE.  AND,

13     THEREFORE, SHE --

14        THE COURT:  THAT'S RACHELLE ANDERSON.

15        MR. CLARKE:  I'M SORRY, RACHELLE ANDERSON, I'M

16     SORRY.  AND, THEREFORE, SHE IS DESERVING OF THE THREE LEVEL

17     UPWARD ADJUSTMENT.

18        THE COURT:  THANK YOU, MR. CLARKE.

19        MR. FEIGE.

20        MR. FEIGE:  YES, YOUR HONOR.  AS NOTED IN MY

21    MEMORANDUM, YOUR HONOR, THERE WAS ALSO A LOT OF THIS

22    TESTIMONY I THINK YOU HEARD LIKE TWO SIDES OF IT BECAUSE

23    THERE WAS ALSO EVEN THE GOVERNMENT'S TESTIMONY THAT MR.

24    QUAIFFAI, HE HAD TALKED ABOUT BAD BOYZ, AND HE TALKED ABOUT

25    HOW HE WAS DOWN THERE, HE TALKED ABOUT WHEN HE WAS AT BAD

7

1    BOYZ THIS BIG E WAS IN CHARGE OF EVERYTHING, HE WAS RUNNING

2    ALL OF THAT, AND HE TALKED ABOUT WILHELMINA BEING PRIMARILY

3    IN CHARGE OF, YOU KNOW, SELLING THE CLOTHES OUT OF THAT

4    STORE.

5        I THINK THE REALITY OF THIS WHOLE SITUATION IS THAT

6    SHE WAS LARGELY INVOLVED WITH ALL OF THESE CLOTHING STORES

7    AND ALL HER OWN LITTLE BUSINESSES, BUT ALSO THIS IS FAMILY,

8    AND, OF COURSE, THAT'S WHY THIS WHOLE THING IS SO DEVESTATING

9    TO HER, HER WHOLE FAMILY HAS BEEN DESTROYED THROUGH THIS

10   WHOLE PROCEEDING, BUT, NEVERTHELESS, SHE WAS ALWAYS THERE

11   WITH THE FAMILY, AND I THINK A LOT OF THE TIMES THAT SHE WAS

12   IN THE STORE, IT WAS A LITTLE BIT -- I CAN JUST PICTURE MANY

13   PARENTS, IF YOU ARE IN YOUR CHILD'S STORE AND THINGS AREN'T

14   GOING RIGHT, JUST TAKING CONTROL.

15       AND I THINK THAT'S LARGELY WHAT SHE DID FROM TIME

16   TO TIME, BUT I DON'T THINK SHE REALLY WAS A TRUE MANAGER.

17       I THINK YOU LOOK AT SOME OF THE TESTIMONY, I

18   REMEMBER ALSO DAVID LYNCH TALKING ABOUT MENA T'S, AND HE
WAS

19   SAYING WHAT DO YOU DO, HE SAID I MANAGE THE STORE, I

20    COLLECTED THE MONEY, I TOOK THE MONEY DOWN TO JOHN ANDERSON,

21    I GOT THE SUPPLIES FROM JOHN ANDERSON; BASICALLY, DAVID LYNCH

22    WAS SAYING THAT HE WAS DOING EVERYTHING.

23        AS FAR AS THE TESTIMONY OF AGENT YIANNOS, THE

24    UNDERCOVER AGENT, IT STILL BOTHERED ME, OBVIOUSLY, IT DIDN'T

25    BOTHER THE JURY, BUT IT BOTHERED ME A LOT, YIANNOS WOULD

8

1   TESTIFY ABOUT ALL OF THESE OCCASIONS HE SAW HER DOWN THERE,

2   AND, OF COURSE, IT WAS ONLY OVER A SIX MONTH PERIOD THAT HE

3   WAS THERE, BUT THEN ON ALL OF THOSE SURVEILLANCES, SHE SHOWED

4   UP LIKE SIX TIMES OR SOMETHING ON THE SURVEILLANCES.

5       AND IT TROUBLED ME PERSONALLY GREATLY HOW SHE COULD

6   HAVE BEEN THERE ALL THE TIMES THESE PEOPLE WERE TALKING ABOUT

7   AND NEVER SHOWING UP ON THE SURVEILLANCES.  I THOUGHT THAT

8   THE SURVEILLANCES REALLY TOLD THE STORY MORE THAN THE

9   TESTIMONY ABOUT HER PRESENCE AND HER INVOLVEMENT.

10       I WOULD SUBMIT TO THE COURT THAT WHILE SHE

11   CERTAINLY WAS A PARTICIPANT, CERTAINLY BECAUSE OF HER FAMILY

12   TIES FROM TIME TO TIME DID TAKE CONTROL OF THINGS, I WOULD

13   SUBMIT THAT SHE DOES NOT RAISE TO THE LEVEL OF THE MANAGER

14   AND SHOULD NOT BE GETTING THIS THREE LEVEL INCREASE.

15       THE COURT:  THANK YOU, MR. FEIGE.  MR. CLARKE,

16   ANYTHING ELSE, SIR?

17       MR. CLARKE:  NO, YOUR HONOR.  THANK YOU.

18       THE COURT:  IN THE PRESENTENCE REPORT, THE OFFENSE

19   LEVEL CALCULATIONS BEGIN AT PAGE -- PAGES TEN AND ELEVEN, AND

20   WE WILL PUT TO ONE SIDE THE BASE OFFENSE LEVEL WHICH IS TAKEN

21   FROM THE DRUG QUANTITY TABLE.  THIS IS DISCUSSED AT PARAGRAPH

22   46.

23      THE PROBATION OFFICE CONCLUDED, AT PARAGRAPH 50,

24   ADJUSTMENT FOR ROLE, THAT THE DEFENDANT WAS DIRECTLY INVOLVED

25   IN STARTING AND OVERSEEING THE BUSINESS CONDUCTED AT MENA T'S

9

1   CONVENIENCE STORE AND BAD BOYZ, SPELLED B-O-Y-Z, AND SHE

2   HELPED MANAGE THE STORES ON CHARLES STREET THROUGHOUT THE

3   PERIOD OF THE CONSPIRACY.

4       PURSUANT TO U.S.S.G. SECTION 3B1.1B, THE OFFENSE

5   LEVEL IS INCREASED THREE LEVELS.  THIS ISSUE IS IMPORTANT FOR

6   TWO REASONS.

7       ONE, TO DETERMINE THE OFFENSE LEVEL, AND, SECOND,

8   TO DETERMINE WHETHER THE SAFETY VALVE IS APPROPRIATE IN THE

9   CASE OF MS. ANDERSON.

10       THE SAFETY VALVE IS FOUND AT 18 U.S.C. SECTION

11   3553, F1-5, AND U.S.S.G SECTION 5C1.2.  UNDER THESE

12   PROVISIONS, THE DEFENDANT CAN RECEIVE A TWO LEVEL DECREASE
OF

13   HER BASE OFFENSE LEVEL AND CAN ALSO RECEIVE A SENTENCE OF

14   IMPRISONMENT BELOW A STATUTORILY MANDATED MINIMUM IF SHE

15   MEETS FIVE CRITERIA.  THESE CRITERIA ARE SET OUT IN SECTION

16   2D1.1B6.

17       THE DEFENDANT BEARS THE BURDEN OF PROVING THAT SHE

18   QUALIFIES FOR THE SAFETY VALVE PROVISION.  ONE OF THE

19   CRITERIA IS THAT THE DEFENDANT MUST NOT HAVE HAD A
LEADERSHIP

20    OR MANAGERIAL ROLE IN THE CRIMINAL ACTIVITY.  THE GUIDELINES

21    AND STATUTE STATE AS FOLLOWS:

22         THAT THE DEFENDANT WAS NOT AN ORGANIZER, LEADER,

23    MANAGER, OR SUPERVISOR OF OTHERS IN THE OFFENSE AS DETERMINED

24    UNDER THE SENTENCING GUIDELINES.

25         THE OPERATIVE LANGUAGE IS SUPERVISOR OF OTHERS,

10

1     BECAUSE IF MS. ANDERSON WAS INDEED A MANAGER, LEADER,

2     ORGANIZER OR SUPERVISOR, THEN SHE WOULD BE INELIGIBLE FOR THE

3     SAFETY VALVE AND ALSO WOULD RECEIVE AN UPWARD ADJUSTMENT OF

4     ANYWHERE BETWEEN ONE AND FOUR LEVELS BASED UPON THE NATURE

5     AND EXTENT OF HER ROLE.

6          SECTION 3B1.1 DETERMINES OR LISTS THE CRITERIA FOR

7     DETERMINING WHETHER ONE WAS AN ORGANIZER OR LEADER, MANAGER,

8     OR SUPERVISOR, OR, IN SUB-PARAGRAPH C, A LEADER, MANAGER, OR

9     SUPERVISOR IN ANY CRIMINAL ACTIVITY OTHER THAN DESCRIBED IN A

10    OR B, AND IT IS UP TO THE COURT.

11         THE COURT, AS MR. CLARKE HAS ACKNOWLEDGED IN OTHER

12    CASES, HAS THE ABILITY TO IMPOSE AN UPWARD ADJUSTMENT IF A

13    DEFENDANT IS A SUPERVISOR OR LEADER USING A FLEXIBLE

14    STANDARD.

15         APPLICATION NOTE 2 STATES THAT TO QUALIFY FOR AN

16    ADJUSTMENT UNDER THIS SECTION, THE DEFENDANT MUST HAVE BEEN

17    THE ORGANIZER, LEADER, MANAGER OR SUPERVISOR OF ONE OR MORE

18    PARTICIPANTS.

19         AN UPWARD DEPARTURE MAY BE WARRANTED, HOWEVER, IN

20    THE CASE OF A DEFENDANT WHO DID NOT ORGANIZE, LEAD, MANAGE,

21    OR SUPERVISE, BUT WHO NONETHELESS EXERCISED MANAGEMENT

22    RESPONSIBILITY OVER THE PROPERTY, ASSETS OR ACTIVITIES OF A

23    CRIMINAL ORGANIZATION.

24         IN ASSESSING WHETHER AN ORGANIZATION IS OTHERWISE

25    EXTENSIVE, ALL PERSONS INVOLVED DURING THE COURSE OF THE

11

1    ENTIRE OFFENSE ARE TO BE CONSIDERED.  IN DISTINGUISHING A

2    LEADERSHIP OR ORGANIZATIONAL ROLE FROM ONE OF MERE MANAGEMENT

3    OR SUPERVISION, TITLES SUCH AS KINGPIN OR BOSS ARE NOT

4    CONTROLLING.

5        FACTORS THE COURT SHOULD CONSIDER INCLUDING THE

6    EXERCISE OF DECISION MAKING AUTHORITY, THE NATURE OF

7    PARTICIPATION IN THE COMMISSION OF THE OFFENSE, THE

8    RECRUITMENT OF ACCOMPLICES, TO CLAIM RIGHT TO A LARGER SHARE

9    OF THE FRUITS OF THE CRIME, THE DEGREE OF PARTICIPATION AND

10    PLANNING AND ORGANIZING THE NATURE AND SCOPE OF THE ILLEGAL

11    ACTIVITY, AND THE DEGREE OF CONTROL OR AUTHORITY EXERCISED

12    OVER OTHERS.  THERE CAN, OF COURSE, BE MORE THAN ONE PERSON

13    WHO QUALIFIES AS THE LEADER OR ORGANIZER OF A CRIMINAL

14    ASSOCIATION OR CONSPIRACY.

15        THIS ADJUSTMENT DOES NOT APPLY IF A DEFENDANT -- TO

16    A DEFENDANT WHO MERELY SUGGESTS COMMITTING THE OFFENSE.

17        HERE, IN MY VIEW, THE ROLE PLAYED BY MS. ANDERSON

18    IS ACCURATELY DESCRIBED IN THE GOVERNMENT'S SENTENCING

19    MEMORANDUM BEGINNING AT PAGE 24.

20      MR. CLARKE HAS TOUCHED ON SOME OF THE POINTS THAT

21    ARE SET OUT IN THE MEMORANDUM, AND I WILL NOT READ THE ENTIRE

22    THING BUT ALSO TOUCH UPON SOME OF THE MORE SALIENT POINTS.

23      AS THE OWNER AND MANAGER OF SOME OF THE RETAIL

24    PARAPHERNALIA SHOPS, MS. ANDERSON'S OFFENSE LEVEL SHOULD BE

25    ADJUSTED UPWARD.

12

1    SHE WAS DIRECTLY INVOLVED IN STARTING AND

2    OVERSEEING THE BUSINESS CONDUCTED AT MENA T'S CONVENIENCE

3    STORE AND BAD BOYZ, AND SHE HELPED MANAGE THE STORES ON

4    CHARLES STREET THROUGHOUT THE PERIOD OF THE CONSPIRACY.

5    ACCORDING TO THE TESTIMONY OF AARON ANDERSON, THE

6    BUSINESS OF MENA T'S AND BAD BOYZ WAS MANAGED BY MS.

7    ANDERSON.  DAVID LYNCH TESTIFIED THAT HE WAS HIRED BY HER TO

8    WORK AT BOTH STORES AND THAT, IN ADDITION TO THE TWO OF THEM,

9    BIG E, STEVE, D, FUZZ, AND THREE OTHER EMPLOYEES WORKED AT

10    THESE TWO STORES FOR MS. ANDERSON.

11    BYRON WISE TESTIFIED THAT SHE WOULD STOCK THE

12    STORES FROM THE INVENTORY AT THE CHARLES STREET STORES.  MS.

13    ANDERSON FILED THE ARTICLES OF INCORPORATION FOR BAD BOYZ AND

14    SHE -- AND HER NAME FREQUENTLY APPEARED ON THE BUSINESS

15    LICENSES FOR THE ANDERSON STORES.

16    RECORDS FOR THE CAPSULE GEL COMPANY INDICATE THAT

17    SHE WAS RESPONSIBLE FOR ORDERING TENS OF THOUSANDS OF GELATIN

18    CAPSULES IN 1998 AND 1999.  JOHN TRIPLINE TESTIFIED THAT SHE

19    MANAGED 1821 CHARLES -- NORTH CHARLES STREET AFTER WALTER

20    FARRAR LEFT.

21        GEORGE WILLIAMS TOLD THE JURY THAT WILHELMINA

22    ANDERSON HIRED HIM TO WORK AT 1816 NORTH CHARLES STREET.  HE

23    ALSO SAID SHE SUPERVISED THE BUSINESS AT 1831 NORTH CHARLES

24    STREET, AND SHE OCCASIONALLY SUPERVISED THE BUSINESS AT 1821.

25        OTHER WITNESSES TESTIFIED THAT MS. ANDERSON

13

1    CONTROLLED THE KEYS TO 1827 NORTH CHARLES.  HE RECALLED TO

2    THE JURY AN OCCASION IN JANUARY OF 1999 WHEN SHE CALLED HIM

3    TO COMPLAIN THAT SHE HAD LOST THREE CUSTOMERS AT 1831 BECAUSE

4    THE AGENT WAS TOO SLOW DELIVERING SIX BOTTLES OF QUININE.

5        AND THEN THERE IS THE DESCRIPTION OF THE RAID ON

6    JANUARY 27, 1997 WHEN SHE PLAYED A LEADERSHIP ROLE AND WAS

7    UPSET ABOUT THE FACT THAT HER EMPLOYEES HAD LET THE POLICE

8    INTO THE STORE.

9        SO, IN MY VIEW, THERE IS MORE THAN AMPLE EVIDENCE

10    DESPITE THE MEMORANDUM POINTS THAT MR. FEIGE HAS RAISED IN

11    HIS SENTENCING MEMORANDUM AND IN THE SUPPLEMENTAL SECOND

12    SENTENCING MEMORANDUM TO DENOMINATE MS. ANDERSON AS A MANAGER

13    OR SUPERVISOR.

14        THE QUESTION IS HOW MANY LEVELS TO INCREASE

15    UPWARDS.  IN MY VIEW, SHE SHOULD BE ASSESSED A TWO LEVEL

16    INCREASE.

17        TWO LEVELS IS APPROPRIATE BECAUSE THIS MEANS THAT

18    SHE WILL RECEIVE MORE LEVELS THAN RACHELLE ANDERSON BUT FEWER

19    LEVELS THAN THE PEOPLE WHO WERE MOST CULPABLE, NAMELY, JOHN

20    ANDERSON AND MR. RONALD MARSHALL.

21        ACCORDINGLY, I WILL ADOPT THE RECOMMENDATIONS OF

22    THE PROBATION OFFICE BUT MAKE A TWO LEVEL UPWARD ADJUSTMENT

23    FOR ROLE.  THIS LEADS US TO THE DETERMINATION OF QUANTITY.

24        MR. FEIGE, IS THERE ANYTHING ELSE THAT YOU WISH TO

25    SAY ABOUT QUANTITY?

14

1        MR. FEIGE:  NO, YOUR HONOR.  I JUST THOUGHT THERE

2     WERE ISSUES OF FORESEEABILITY, AND I THINK THE COURT CAN TAKE

3     INTO CONSIDERATION THE MANAGERIAL POSITION AND I HAVE NOTHING

4     FURTHER TO SAY.

5        THE COURT:  THANK YOU.

6        MR. FEIGE:  I THINK IT WAS COVERED IN THE EARLIER

7     PROCEEDINGS.

8        THE COURT:  THAT IS CORRECT.  IN EARLIER PROCEEDINGS

9     IN THIS CASE, I HAVE DETERMINED THAT THE -- OR I ACCEPT THE

10     VIEW OF THE GOVERNMENT IN DETERMINING QUANTITY WHICH DRIVES

11     THE INITIAL DETERMINATION OF OFFENSE LEVEL.

12        THE BASE OFFENSE LEVEL OF 38 APPLIES TO 30 OR MORE

13     KILOGRAMS OF HEROIN, 150 OR MORE KILOGRAMS OF COCAINE, AND

14     1.5 KILOGRAMS OF CRACK COCAINE.

15        HERE, UNDER A VARIETY OR A NUMBER OF MEASURES, THE

16     CONSPIRACY TO AID AND ABET THE DISTRIBUTION OF DRUGS IS -- OR

17     AIDED AND ABETTED THE DISTRIBUTION OF QUANTITIES IS FAR, FAR

18     IN EXCESS OF THE QUANTITIES STATED AT OFFENSE LEVEL 38.

19        FIRST, THIS WAS A LONG STANDING CONSPIRACY OF OVER

20    SIX YEARS.  THE BUSINESS RECORDS AT THE U.S. CUSTOMS SERVICE

21    SHOWED THAT THE ORGANIZATION SOLD APPROXIMATELY 13,081

22    KILOGRAMS OF MANNITOL IN THE FORM OF FIVE THOUSAND -- OR,

23    EXCUSE ME, 532,240 BLOCKS.

24        THIS QUANTITY OF MANNITOL, WHEN COMBINED WITH

25    QUININE, WOULD DILUTE APPROXIMATELY 2,293 KILOGRAMS OF

15

1    HEROIN, CREATING A MIXTURE OF HEROIN AT 13 PERCENT PURITY

2    THAT WOULD WEIGH 18,347 KILOGRAMS.

3         THE RECORD AT TRAIL ESTABLISHED THAT THE GROUP SOLD

4    SOME 21 MILLION GELATIN CAPSULES, ENOUGH TO ENCAPSULATE 6,351

5    KILOGRAMS OF HEROIN.

6         THE RECORD ALSO ESTABLISHED THAT THE GROUP SOLD

7    APPROXIMATELY 21 MILLION GLASS VIALS, ENOUGH TO ENCAPSULATE

8    SOME 2,741 KILOGRAMS OF CRACK COCAINE.

9         ANOTHER MEASURE IS THE AMOUNT OF DRUGS AND DRUG

10   PARAPHERNALIA SEIZED FROM DRUG DEALERS AFTER THEY HAD MADE

11   PURCHASES FROM THE DEFENDANT'S STORE, AND, IF ONE LOOKS AT

12   THE DRUG PURCHASES, OR THE DRUG SEIZURES FROM PURCHASERS THAT

13   WERE TESTIFIED TO, IT IS CLEAR THAT THIS -- THE AIDING AND

14   ABETTING WAS IN AMOUNTS FAR, FAR IN EXCESS OF THE LEVELS

15   STATED IN OFFENSE LEVEL 38.

16        ACCORDINGLY, I ADOPT THE CALCULATIONS MADE BY THE

17   SENTENCING OR BY THE PROBATION OFFICE AS REFLECTED IN

18   PARAGRAPH 47, AND I ALSO ADOPT THE CONCLUSIONS THAT I HAVE

19   MADE IN THE OTHER RELATED CASES.

20          ACCORDINGLY, THE BASE OFFENSE LEVEL IS 38.  THERE

21    IS AN UPWARD ADJUSTMENT OF TWO LEVELS FOR ROLE, YIELDING A

22    TOTAL OFFENSE LEVEL OF 40.

23          MR. FEIGE:  YOUR HONOR, I JUST WANTED TO JUST SAY

24    THAT WHILE I DID NOT HAVE ANY FURTHER ARGUMENT ON THE

25    FORESEEABILITY, I JUST WANTED TO RESERVE -- I AM STILL

16

1    RESERVING THE OBJECTIONS WE MADE AT THE EARLIER PROCEEDINGS.

2        THE COURT:  ABSOLUTELY.  THE OBJECTION IS NOTED AND

3    PRESERVED.

4        THIS LEADS TO TWO ISSUES HAVING TO DO WITH THE

5    NUMBER OF LEVELS TO DECREASE DOWNWARDS UNDER THE RATIONALE OF

6    THE POSTERS CASE, AND, SECOND, THE ISSUE OF MS. ANDERSON'S

7    HEALTH, AND IT SEEMS TO ME THAT THESE TWO ARE SOMEWHAT

8    INTERRELATED AND I WOULD LIKE TO HEAR ABOUT BOTH AT THE SAME

9    TIME.

10        MR. CLARKE, IF YOU WOULD GO FIRST, PLEASE.

11        MR. CLARKE:  YOUR HONOR, THE COURT WANTS TO HEAR

12    ABOUT THE POSSIBILITY OF A DOWNWARD DEPARTURE FOR HEALTH

13    REASONS, AND THE SECOND ISSUE, YOUR HONOR?

14        MR. FEIGE:  POSTERS.

15        MR. CLARKE:  OH, POSTERS.

16        THE COURT:  POSTERS.

17        MR. CLARKE:  I SEE.  WELL, POSTERS, YOUR HONOR,

18    CLEARLY, MS. ANDERSON DESERVES MORE OF A DOWNWARD DEPARTURE

19    THAN MR. MARSHALL AND MR. ANDERSON.

20         THIS COURT HAS GRANTED, I BELIEVE, LEVELS OF EIGHT

21    AND NINE; EIGHT TO MR. JOHN TRIPLINE, AND EIGHT TO MR. THOMAS

22    TRIPLINE, NINE TO RACHELLE ANDERSON.

23         THE GOVERNMENT DOESN'T REALLY HAVE ANY POINT OF

24    VIEW, WHETHER IT SHOULD BE EIGHT OR NINE.  I THINK THE COURT

25    CAN DERIVE ITS OWN CONCLUSION ON THAT.

17

1        AS TO THE DOWNWARD DEPARTURE FOR HEALTH REASONS, I

2    WOULD JUST NOTE THE VERY EXPLICIT LANGUAGE CONTAINED IN

3    SENTENCING GUIDELINE 5H1.4, WHICH DOESN'T JUST TALK ABOUT

4    POOR HEALTH, BUT TALKS ABOUT EXTRAORDINARY PHYSICAL

5    IMPAIRMENT, PROVIDES AN EXAMPLE OF A SERIOUSLY INFIRM

6    DEFENDANT THAT MIGHT REQUIRE BETTER CARE AT HOME AND THAT

7    SORT OF THING.

8        CLEARLY, FROM WHAT I HAVE HEARD THUS FAR, AND WHAT

9    I HAVE READ, THE TYPE OF AILMENTS THAT MS. ANDERSON HAS,

10    ALBEIT UNFORTUNATE, ARE THE TYPE OF AILMENTS THAT CAN BE

11    HANDLED BY THE BUREAU OF PRISONS RATHER READILY, AND CLEARLY

12    DON'T WARRANT A DOWNWARD DEPARTURE.

13        THANK YOU.

14        THE COURT:  THANK YOU.  MR. FEIGE, I'D BE HAPPY TO

15    HEAR FROM YOU, SIR.

16        MR. FEIGE:  O.K..  FIRST, YOUR HONOR, AS THE COURT

17    IS AWARE, I EARLIER SENT TO THE COURT A COPY OF HER MEDICAL

18    RECORDS.

19        I HAVE AN ADDITIONAL COPY, I DON'T KNOW IF IT'S

20    APPROPRIATE, IF THE COURT WISHES, I CAN MAKE THAT AS AN

21    EXHIBIT NOW, --

22        THE COURT:  I WOULD THINK THAT THE PROPER COURSE AT

23    THIS TIME WOULD BE TO MAKE THE MEDICAL RECORDS AN OFFICIAL

24    AND THAT WAY IT WILL ACCOMPANY THE OFFICIAL TRANSCRIPT.

25        MR. FEIGE:  ALSO I WILL PRESENT TO THE COURT TWO

18

1    ADDITIONAL DOCUMENTS THAT MS. ANDERSON PROVIDED ME THIS

2    MORNING.  I GAVE COPIES TO MR. CLARKE.

3         ONE IS AN UPDATED MEDICAL REPORT, AND THE SECOND

4    DOCUMENT IS A DISABILITY RATING FROM THE SOCIAL SECURITY

5    ADMINISTRATION THAT WAS JUST AWARDED THIS YEAR, I WILL TALK

6    ABOUT THOSE, SO I JUST WOULD PUT THEM ALL TOGETHER AND JUST

7    MAKE IT ONE EXHIBIT.

8         THE COURT:  THANK YOU.

9              (THEREUPON, THE DOCUMENTS REFERRED TO

10   WERE MARKED DEFENDANT'S EXHIBIT NO. 1)

11        MR. FEIGE:  I THINK THE COURT IS UNAWARE OF THIS, I

12   WAS UNAWARE UNTIL LAST FRIDAY OF HER RECEIPT OF THE

13   DISABILITY RATING.  YOUR HONOR, IF I MAY JUST FIRST TALK

14   ABOUT HER MEDICAL, AND THEN I WILL TALK ABOUT THE POSTERS,

15   AND, VERY CANDIDLY, AS I HAVE BEEN THINKING ABOUT THE

16   MEDICALS, THERE IS A QUESTION THAT IT RAISES IN MY OWN MIND

17   AND I DON'T KNOW THE ANSWER, AND IT CERTAINLY HASN'T BEEN

18   BRIEFED BY ME NOR BY THE GOVERNMENT, OR MAYBE THE COURT

19   HASN'T THOUGHT OF IT EITHER, RIGHT NOW WE ARE SET -- ALSO,

20   SINCE I WAS THINKING BACK ON RACHELLE ANDERSON'S SENTENCING

21    ON FRIDAY, WE WERE FACED WITH A TEN YEAR MANDATORY MINIMUM,

22    AND I DON'T KNOW WHETHER THE SECTION DEALING WITH HEALTH AT

23    SECTION 5H1.4 ALLOWS YOU TO GO BELOW THE TEN.

24        I WOULD IMAGINE IT DOES, BUT I CERTAINLY HAVE DONE

25    NO RESEARCH ON THAT, AND I DON'T KNOW IF THE COURT WERE TO

19

1     FIND IT APPROPRIATE WHETHER OR NOT YOU CAN GO BELOW THE TEN

2     YEAR MANDATORY MINIMUM BASED ON 5H1.4, BUT I WOULD BE ASKING

3     YOU TO DO SO.

4          THE COURT:  WELL, IT WOULD SEEM TO ME, AND THIS IS

5     AN ISSUE I HAVE NOT RESEARCHED, BUT IT APPEALS TO ME AS A

6     MATTER OF COMMON SENSE THAT ONE WOULD HAVE TO BE ABLE TO

7     DEPART DOWNWARDS BELOW A MANDATORY MININUM.

8          LET'S ASSUME THAT YOU HAD A PERSON WHO WAS REALLY

9     AT DEATH'S DOOR AND WHO SHOULD BE HOSPITALIZED, OR IN AN OLD

10     AGE HOME, IT WOULDN'T MAKE SENSE TO HAVE THE POWER TO DEPART

11     FOR PHYSICAL CONDITION BUT NOT BE ABLE TO GO BELOW A

12     MANDATORY MININUM, SO, IN MY VIEW, I DO HAVE THE POWER TO DO

13     THAT.

14          MR. FEIGE:  IF I MAY BEGIN, YOUR HONOR, FIRST OF

15     ALL, AS SET OUT IN THE MEDICAL REPORTS, AND ALSO I CAN

16     SUPPLEMENT IT TODAY IF I NEED TO JUST BY MS. ANDERSON'S BRIEF

17     TESTIMONY, BUT ITS MY UNDERSTANDING SHE IS -- FIRST OF ALL,

18     SHE IS TAKING THE FOLLOWING MEDICATIONS.

19          SHE HAS HIGH BLOOD PRESSURE.  YOU WILL NOTE IN THE

20    MEDICAL REPORT, WHICH IS THE MOST RECENT ONE I RECEIVED FROM

21    THE HARFORD COUNTY DEPARTMENT OF SOCIAL SERVICES, SHE WAS --

22    HER BLOOD PRESSURE THEN WAS 160 OVER 100, WHICH IS GETTING

23    INTO THE HIGH AND INTO THE DANGEROUS ZONE, IF NOT PROPERLY

24    MONITORED.

25        SHE IS TAKING ACCUPRIL AND LASIX FOR THAT.  I DON'T

20

1  KNOW IF I HAVE TO DESCRIBE IT, BUT ACCUPRIL IS MAINLY TO DEAL

2  WITH THE BLOOD PRESSURE.  LASIX HELPS YOU GET A LOT OF THE

3  WATER OUT OF THE SYSTEM, BECAUSE THAT'S ONE OF THE PROBLEMS

4  WITH ELDERLY PEOPLE, TO AVOID CONGESTIVE HEART FAILURE, AND

5  BOTH OF THOSE MEDICATIONS I KNOW PERSONALLY AND I THINK THE

6  COURT IS PROBABLY AWARE, IT'S CRUCIAL THAT SHE RECEIVE THEM

7  ON A DAILY BASIS.

8       IF SHE DOESN'T RECEIVE THEM, SHE IS LIKELY TO HAVE

9  A STROKE AT ANY TIME.

10      SECOND, -- SO SHE HAS A SUBSTANTIAL BLOOD PRESSURE

11  PROBLEM.  SHE IS BEING TREATED WITH ACCUPRIL AND LASIX.

12      SECONDLY, SHE ALSO HAS ASTHMA.  SHE IS BEING

13  TREATED FOR THAT.

14      SHE TAKES A DRUG CALLED ALBUTEROL,

15  A-L-B-U-T-E-R-O-L. THERE IS A NEW DRUG SHE TOLD ME SHE JUST

16  GOT A PRESCRIPTION FOR SHE IS TAKING ALSO CALLED VANCERIL,

17  V-A-N-C-E-R-I-L.

18      SHE USES A REGULAR INHALER FROM TIME TO TIME AND

19  ALSO THERE IS A SPECIAL MACHINE THAT SHE USES THAT'S CALLED A

20  NEBULIZER MACHINE.  WHEN I SENT THE LETTER TO THE COURT, SHE

21    SAID SHE WAS USING IT A COUPLE TIMES A MONTH.

22        SHE TELLS ME SHE IS USING IT MUCH MORE FREQUENTLY

23    PROBABLY AS A RESULT OF THE DIFFICULT WEATHER WE HAVE BEEN

24    HAVING OVER THE LAST SEVERAL WEEKS.

25        SHE IS TAKING ^PREMPERIL, WHICH IS AN ESTROGEN

21

1    PILL.  SHE IS ALSO TAKING A PILL CALLED LIPITOR, WHICH IS FOR

2    HER HIGH CHOLESTEROL, AND, FINALLY, SHE IS ALSO TAKING A PILL

3    CALLED PAXIL, P-A-X-I-L, SHE TAKES IT FROM TIME TO TIME, AND

4    I THINK THE COURT NOTED DURING THE TRIAL SHE IS SUBJECT TO

5    PANIC ATTACKS AND IT'S SOMETHING THAT CAN HELP HER CONTROL

6    HER EMOTIONS FROM TIME TO TIME.

7         AND THEN FINALLY SHE IS ALSO TAKING A VARIETY OF

8    DRUGS, SHE HAS A STENOSIS OF THE SPINE, SHE IS HAVING A LOT

9    OF PROBLEMS WITH HER BACK AND LEGS.

10        IN FACT, I THINK IT WAS DURING THE COURSE OF THE

11   TRIAL SHE MISSED A DAY OR TWO WHEN SHE SAW PHYSICIANS DEALING

12   WITH THE PROBLEMS THAT SHE IS HAVING WITH HER SPINE.

13        SHE IS TAKING -- OR SHE WAS TAKING FLEXERIL,

14   F-L-E-X-E-R-I-L, BUT NOW SHE IS TAKING ANOTHER PILL WHICH SHE

15   SAYS IS A SIMILAR GENERIC ONE, IT'S CYCLOBENZIPRINE, I THINK

16   IT'S C-Y-C-L-O-B-E-N-Z-I-P-R-I-N-E.

17        SHE IS ALSO TAKING TWO OTHER PILLS FOR PAIN

18   MANAGEMENT.  THAT'S OXYCONTIN, O-X-Y-C-O-N-T-I-N, AND

19   OXYCODONE, O-X-Y-C-O-D-O-N-E, WITH -- THE BACK HAS CAUSED HER

20    TREMENDOUS DISCOMFORT AND PAIN.

21         I THINK PROBABLY THAT'S HER PRIMARY MEDICAL

22    PROBLEMS BUT THE OTHER PROBLEM IS WHAT SHE IS EXPRESSING TO

23    ME AND IF THE COURT WISHES I CAN HAVE HER JUST TELL YOU

24    BRIEFLY, WHETHER YOU WANT TO HAVE HER TESTIFY OR SHE CAN JUST

25    TALK FROM THE TABLE, BUT SHE IS ALSO HAVING A LOT OF PROBLEMS

22

1    WITH HER BOWELS AND URINARY TRACT, SHE HAS GOT A LOT OF

2    INCONTINENCE.

3        I JUST KNOW FROM MY NINETY YEAR OLD MOTHER'S

4    PROBLEMS WITH LASIX, IT'S LIKE A CONSTANT INCONTINENCE

5    PROBLEM.  SHE IS HAVING A LOT OF PROBLEMS IN THAT AREA, AND

6    THAT'S VERY DISTURBING TO HER AND VERY TROUBLING, AND SHE IS,

7    OF COURSE, IT'S A VERY EMBARRASSING SITUATION, IT'S A VERY

8    DIFFICULT SITUATION TO TOLERATE, AND, OF COURSE, SHE IS

9    TERRIFIED IN A CUSTODIAL SITUATION DEALING WITH THAT KIND OF

10    PROBLEM, AND I WOULD HAVE TO UNDERSTAND HER CONCERN; JUST IN

11    MY GENERAL EXPERIENCE, MOST JAILERS OR MOST PEOPLE WORKING AT

12    THE PRISONS AREN'T GOING TO RUN AND TAKE CARE OF HER PROBLEMS

13    AND GIVE HER THE KIND OF ATTENTION THAT SHE WOULD WANT WHEN

14    THESE EMERGENCIES OCCUR.

15        AND, MS. ANDERSON, SOLELY WITH REGARD TO YOUR

16    HEALTH, WE ARE NOT TALKING ABOUT ANY OTHER ISSUES THAN YOUR

17    HEALTH, IS THERE ANYTHING THAT YOU THINK WE NEED TO TELL THE

18     JUDGE, OR DOES THAT ADEQUATELY EXPLAIN YOUR MEDICAL

19     CONDITION?

20          MS. ANDERSON:  MY MEDICAL CONDITION IS SERIOUS.  I

21     DON'T WANT NO MORE BETTER TREATMENT THAN MY CHILDREN
HAVE,

22     BUT I ASK THE JUDGE AND THE STATE OF -- AND THE GOVERNMENT TO

23     MAKE SURE I HAVE ADEQUATE MEDICAL TREATMENT.

24          I DON'T KNOW HOW MR. CLARKE FOUND THAT AN

25     INSTITUTION CAN DEAL WITH MY MEDICAL PROBLEMS.  HE IS NOT MY

23

1    DOCTOR.

2         MR. FEIGE:  WELL, --

3         MS. ANDERSON:  I AM NOT BEING DISRESPECTFUL, YOUR

4    HONOR, BUT HE IS NOT MY DOCTOR.  I HAVE A RESPIRATORY

5    DISEASE.  I HAVE A DAMAGED LUNG.

6         MR. FEIGE:  OKAY.

7         MS. ANDERSON:  NO, IT'S NOT FAIR.

8         THE COURT:  GO AHEAD, MS. ANDERSON.

9         MS. ANDERSON:  I DON'T WANT NOTHING FROM THIS COURT

10   BUT PROPER MEDICAL TREATMENT.  I ASK NO MORE THAN WHAT MY

11   KIDS GET.

12        THE COURT:  THANK YOU VERY MUCH.

13        MS. ANDERSON:  I JUST WANT TO BE TAKEN CARE OF

14   PROPERLY.

15        MR. FEIGE:  OKAY.  YOUR HONOR, I WOULD JUST STRESS,

16   AGAIN, IT'S ONE OF MY CONCERNS WITH A LOT OF HER MEDICAL

17   PROBLEMS BUT PARTICULARLY THE HYPERTENSION, WHICH UNDOUBTEDLY

18   THERE IS NUMEROUS PEOPLE IN PRISONS WITH HYPERTENSION, BUT,

19   NEVERTHELESS, IT'S ONE OF MY OVERRIDING CONCERNS IN THIS

20     CASE, WE HAVE A 57 YEAR OLD WOMAN WITH EXTENSIVE

21     HYPERTENSION, EXTENSIVE OTHER MEDICAL PROBLEMS, AND,

22     OBVIOUSLY, I HAVE A GREAT DEAL OF CONCERN ABOUT THE CARE AND

23     TREATMENT THAT SHE IS GOING TO RECEIVE IN A MEDICAL FACILITY,

24     BECAUSE IF SHE DOESN'T GET IT, THE LIKELIHOOD, I THINK, OF A

25     STROKE IS VERY GREAT.

24

1        THE COURT:  NOW, LET ME ASK YOU THIS.  WHERE DO --

2   FOR SOMEONE WITH MS. ANDERSON'S CONDITION, IS THERE A SPECIAL

3   FACILITY WITHIN THE PRISON SYSTEM WHERE SHE COULD BE TREATED

4   AND EVALUATED?

5        MR. FEIGE:  WELL, IT USED TO ALWAYS BE THERE WAS

6   TWO FACILITIES THAT I WAS AWARE OF, AND I DON'T KNOW WHETHER

7   THEY HAVE CHANGED NOW, BUT I THINK -- IS IT LEXINGTON THAT

8   COULD BE UTILIZED?

9        MS. KERNAR:  I KNOW OF ONE THAT WOULD BE UTILIZED

10   IN TEXAS, YOUR HONOR.

11        THE COURT:  IN TEXAS?  DO YOU REMEMBER THE NAME?

12        MS. KERNAR:  NOT OFF THE TOP OF MY HEAD, YOUR

13   HONOR.

14        MR. FEIGE:  AND I THOUGHT THERE USED TO BE A

15   FACILITY IN NORTH CAROLINA.  MAYBE THAT WAS JUST FOR MALES,

16   BUT I REMEMBER IT WAS ALWAYS MY RECOLLECTION EITHER I THINK

17   IT WAS LEXINGTON, KENTUCKY OR -- BECAUSE I REMEMBER OVER THE

18   MANY YEARS, I HAD MANY PEOPLE WITH MEDICAL PROBLEMS ENDING
UP

19   IN LEXINGTON, BUT IT ALSO SEEMED LIKE THERE WAS A FACILITY IN

20   NORTH CAROLINA.

21        THE COURT:  THANK YOU.  AND THEN ALSO FOR -- ON THE

22   POSTERS RATIONALE, MR. FEIGE?

23        MR. FEIGE:  YOUR HONOR, I MEAN LOOKING AT -- IF THE

24   COURT IS COMING -- WELL, FIRST OF ALL, I AM SIMPLY ASKING FOR

25   AN 11 LEVEL DEPARTURE SIMILAR TO WHAT MR. GLADSTONE ASKED.

25

1          I WOULD LOOK AT -- IF YOU ARE STARTING AT A 40, AND

2     IF YOU AREN'T GIVING -- SINCE YOU CAN'T GO BELOW A TEN YEAR

3     GUIDELINE, ONCE YOU GET DOWN TO A 32, WHICH IS EVEN AN 8

4     LEVEL, YOU ARE AT 121 MONTHS AT THE BOTTOM, WHICH IS TEN

5     YEARS, I WOULD ASK FOR AN 11 LEVEL DEPARTURE.

6          BUT, AGAIN, IT'S -- ONCE YOU GET BELOW THE 120, IT

7     DOESN'T REALLY MATTER.

8          THE COURT:  THANK YOU.  NOW, --

9          MR. FEIGE:  BECAUSE I THINK YOU ARE STUCK WITH

10    THAT.

11          THE COURT:  I HAD A QUESTION ABOUT --

12          MR. FEIGE:  FORMALLY, I WOULD ASK FOR AN 11 OR FOR

13    WHATEVER OTHER DEPARTURE THE COURT FEELS IS APPROPRIATE
UNDER

14    ALL THE FACTS AND CIRCUMSTANCES.

15          THE COURT:  THANK YOU.  THERE IS A QUESTION I HAVE

16    ABOUT THE CRIMINAL HISTORY COMPUTATION.  ACCORDING TO PAGE
13

17    OF THE PRESENTENCE REPORT, --

18          MR. FEIGE:  OH, I SAW THAT.

19          THE COURT:  -- PARAGRAPH 64, IT STATES THAT THE

20    TOTAL OF THE CRIMINAL HISTORY POINTS IS ZERO.  ACCORDING TO

21    THE SENTENCING TABLE AT U.S.S.G. CHAPTER 5, PART A, ZERO

22    CRIMINAL HISTORY POINTS ESTABLISHED A CRIMINAL HISTORY

23    CATEGORY OF TWO, AND THEN WE HAVE A I, AND WE HAD THE COURT

24    DISPOSITIONS BASED UPON THE DATE OF ARREST OF JANUARY 27,

25    1997, SO THE ULTIMATE QUESTION IS -- ARE WE ALL AGREED THAT

26

1    IT'S ONE; TWO, --

2          MR. FEIGE:  MY UNDERSTANDING IS -- I NOTICED THAT

3    THIS MORNING WHEN I WAS REVIEWING IT AGAIN IN THE CAFETERIA.

4    IT'S MY UNDERSTANDING FROM SPEAKING TO THE PROBATION
OFFICER,

5    IT SHOULD HAVE BEEN THE I, WHICH IS OUT IN THE RIGHT HAND

6    GUIDELINES.  IS THAT CORRECT?

7          MS. KERNAR:  CORRECT.

8          THE COURT:  GOOD.

9          MR. CLARKE:  AND THE GOVERNMENT CONCURS, YOUR

10    HONOR.

11          THE COURT:  GOOD.  THANK YOU.  THEN THE CRIMINAL

12    HISTORY CATEGORY IS INDEED I.

13           THERE ARE TWO ISSUES THAT ARE IN A SENSE RELATED,

14    PARTICULARLY BECAUSE, IN DETERMINING HOW MANY LEVELS
DOWNWARD

15    TO DEPART UNDER POSTERS, I MUST TAKE INTO CONSIDERATION

16    MATTERS SUCH AS ROLE IN THE OFFENSE, THE EXTENSIVE NATURE OF

17    ONE'S PARTICIPATION, AND, HERE, HEALTH IS, IN A WAY, RELATED,

18    BECAUSE ILL HEALTH MAKES IT MORE DIFFICULT TO HAVE

19    SUPERVISED, MANAGED AND CARRIED ON THE CONSPIRACY.

20          IN MY VIEW, THERE SHOULD NOT BE A DOWNWARD

21     DEPARTURE BASED UPON ILL HEALTH.  I DO NOT -- CERTAINLY

22     THE -- I DO NOT CONTEST THE FACT THAT MS. ANDERSON IS NOT A

23     WELL WOMAN AT THIS POINT.  BUT, AS MR. CLARKE POINTED OUT, AT

24     SECTION 5H1.4, THE GUIDELINES PROVIDE THAT PHYSICAL CONDITION

25     IS NOT ORDINARILY RELEVANT IN DETERMINING WHETHER A
SENTENCE

27

1    SHOULD BE OUTSIDE THE APPLICABLE GUIDELINE RANGE.

2         HOWEVER, AN EXTRAORDINARY PHYSICAL IMPAIRMENT MAY

3    BE A REASON TO IMPOSE A SENTENCE BELOW THE APPLICABLE

4    GUIDELINE RANGE; E.G., IN THE CASE OF A SERIOUSLY INFIRM

5    DEFENDANT, HOME DETENTION MAY BE AS EFFICIENT AS AND LESS

6    COSTLY THAN IMPRISONMENT.

7         HERE, I AM CONFIDENT THAT MS. ANDERSON WILL BE ABLE

8    TO RECEIVE ADEQUATE MEDICAL TREATMENT WITHIN THE SYSTEM.

9    MEDICAL TREATMENT WITHIN THE PRISON SYSTEM IS, IN MANY CASES,

10   QUITE GOOD.

11        NONE OF HER CONDITIONS, WHILE SERIOUS, ARE NOT SO

12   SERIOUS THAT SHE WOULD BE REQUIRED TO BE PLACED IN A HOSPICE

13   OR AN OLD AGE HOME OR SOME OTHER PLACE WHERE SHE WOULD

14   RECEIVE AROUND THE CLOCK TREATMENT.

15        I WILL MAKE A RECOMMENDATION AT THE END OF THE

16   SENTENCING TODAY THAT MS. ANDERSON BE PLACED WHERE SHE CAN BE

17   COMPLETELY EVALUATED FOR MEDICAL TREATMENT AND HOUSED WHERE

18   SHE COULD BE TREATED BEST FOR HER SERIOUS PHYSICAL

19   CONDITIONS.

20          SO I WILL DENY THE MOTION FOR A DOWNWARD DEPARTURE

21     BASED UPON PHYSICAL CONDITION.  I WILL, HOWEVER, GRANT A

22     DOWNWARD DEPARTURE BASED UPON THE RATIONALE OF THE

POSTERS

23     CASE.

24          I WILL DEPART DOWNWARDS BY NINE LEVELS, WHICH TAKES

25     US TO AN OFFENSE LEVEL 31, CRIMINAL HISTORY CATEGORY I, WHERE

28

1   THE RANGE IS 108 MONTHS ON THE LOW SIDE TO 135 MONTHS ON THE

2   HIGH SIDE, AND WE ARE LOOKING AT A 120 MONTH MANDATORY

3   MINIMUM.

4        ALSO, THERE IS THE MATTER OF SENTENCING UNDER THE

5   SECOND PRONG OF COUNT ONE.  COUNT ONE HAS TWO PRONGS,
CHARGES

6   TWO BASIC CONSPIRACIES.

7        THE FIRST IS A CONSPIRACY TO SELL DRUG

8   PARAPHERNALIA IN VIOLATION OF 21 U.S.C. SECTION 846, AND THE

9   SECOND IS A CONSPIRACY TO AID AND ABET IN THE DISTRIBUTION OF

10   A CONTROLLED DANGEROUS SUBSTANCE IN VIOLATION OF TITLE 18

11   U.S.C. SECTION 2.  MS. ANDERSON WAS CONVICTED UNDER BOTH

12   PRONGS.

13        THE 120 MONTH STATUTORY MINIMUM MANDATORY SENTENCE

14   APPLIES TO THE AIDING AND ABETTING OF THE DISTRIBUTION OF

15   CONTROLLED SUBSTANCES.  THE FIRST PRONG, CONSPIRACY TO SELL

16   DRUG PARAPHERNALIA, RESULTS IN AN OFFENSE LEVEL OF 12,

17   CRIMINAL HISTORY CATEGORY I.

18        THIS SENTENCE WOULD RUN CONCURRENTLY RATHER THAN

19   CONSECUTIVELY TO THE 120 MONTH MANDATORY MINIMUM.  WHAT I

20    HAVE DONE IN THE PAST, AND WOULD DO IN THIS CASE, UNLESS

21    THERE IS AN OBJECTION, IS TO DEPART UPWARDS BASED UPON THE

22    SERIOUSNESS OF THE PARAPHERNALIA DISTRIBUTION FROM A LEVEL
12

23    TO A LEVEL 17, A FIVE LEVEL UPWARD DEPARTURE, AND SENTENCE AT

24    THE LOW END OF THE RANGE, WHICH IS 24 MONTHS; THAT 24 MONTHS

25    TO RUN CONCURRENTLY WITH THE MINIMUM MANDATORY SENTENCE
AND

29

1    THEREFORE NOT INCREASING THE OVERALL SENTENCE IN ANY WAY.

2    MR. FEIGE, IS THERE AN OBJECTION TO THAT, SIR?

3        MR. FEIGE:  NO, YOUR HONOR.

4        THE COURT:  THANK YOU.  BEFORE IMPOSING SENTENCE, I

5    WOULD BE HAPPY TO HEAR FROM MR. CLARKE, FROM MR. FEIGE, AND

6    ALSO FROM MS. ANDERSON, IF SHE WISHES TO ALLOCUTE.  MR.

7    CLARKE?

8        MR. CLARKE:  YOUR HONOR, THE GOVERNMENT HAS NOTHING

9    FURTHER TO SAY AT THAT POINT.

10       THE COURT:  THANK YOU.  MR. FEIGE.

11       MR. FEIGE:  JUST VERY BRIEFLY.  I FIND THIS CASE A

12   VERY SAD CASE, IT'S A VERY TROUBLING CASE, AND I FIND IT

13   ALSO -- I AM NOT GOING TO GET INTO THE WHOLE THING, BUT I

14   FIND A LOT OF TROUBLE WITH THE APPLICATION OF THE GUIDELINES

15   TO THIS WHOLE MATTER.

16       WHEN I THINK BACK ABOUT THE CASE AND I THINK ABOUT

17   SITTING OVER WHERE MR. CLARKE SITS AND I THINK ABOUT THE

18   SHEER NUMBERS THAT WERE PRESENTED, I MEAN IT IS SHOCKING AND

19   DISTURBING IN THAT RESPECT.

20       IT ALSO BOTHERS ME BECAUSE I THINK THAT THIS REALLY

21    SHOULD HAVE BEEN TREATED, AND THE COURT HAS DONE WHAT THE

22    COURT CAN DO UNDER THE GUIDELINES, TREAT THIS MORE AS A

23    PARAPHERNALIA CASE, WHICH I THINK IS THE PROPER WAY TO TREAT

24    THIS CASE, BUT THE GUIDELINES HAVE TAKEN SO MUCH OUT OF THE

25    COURT'S CONTROL, I FIND THE SENTENCE THAT THE COURT IS GOING

30

1    TO HAVE TO IMPOSE UPON MS. ANDERSON VERY SAD.

2         AND I GUESS WHAT BOTHERS ME IS JUST DURING THE

3    COURSE OF THIS TRIAL, I GOT TO TALK TO VIRTUALLY ALL OF THESE

4    DEFENDANTS FROM TIME TO TIME, YOU STAND AROUND AND YOU CHAT A

5    LITTLE BIT, AND WHILE WHAT THEY DID IS TERRIBLE IN TERMS OF

6    FURTHER FACILITATING THE DRUG DISTRIBUTION BUSINESS, NONE OF

7    THEM ARE BAD PEOPLE.

8         THEY ARE ALL GOOD PEOPLE.  I TALKED TO THEM ALL.

9    THEY ARE NICE PEOPLE.

10        THEY ARE PLEASANT.  SOME OF THEM ARE MORE ASTUTE

11    OTHERS, SOME OF THEM A LITTLE MORE HARDHEADED THAN OTHERS,

12    BUT SOME OF THEM ARE VERY, VERY BRIGHT.

13        RONALD MARSHALL WAS A VERY NICE GUY, REALLY A SMART

14    GUY.  REALLY, IT'S A SHAME WHAT'S HAPPENING TO THESE LIVES,

15    AND IT'S DEVASTATING TO MY CLIENT, I MEAN SHE IS NOT JUST

16    LIKE ANOTHER DEFENDANT IN ANOTHER DRUG CASE OR SOMETHING,

17    THIS IS HER WHOLE FAMILY, AND HER FAMILY, TO HER, IS HER

18    LIFE.

19        WE HAVE HAD SOME VERY EMOTIONAL CONVERSATIONS.  I

20    DON'T KNOW, SHE IS GOING TO TALK TO YOU, I THINK.

21        MS. ANDERSON:  I AM.

22        MR. FEIGE:  ALL RIGHT.  AND I AM SURE SHE IS GOING

23    TO EXPRESS A LOT OF IT.  IT'S -- I DON'T REALLY KNOW WHERE

24    I'M GOING WITH THESE THOUGHTS, BUT I JUST FIND THIS A VERY

25    TROUBLESOME AND VERY SAD CASE, AND I THINK WE CAN GET INTO

31

1    MORE COCKTAIL TALK ABOUT THE APPROPRIATENESS OF THE

2    GUIDELINES IN OUR SYSTEM, I THINK IT'S TERRIBLE WHAT'S

3    HAPPENING TO THESE PEOPLE, ALBEIT THAT THEY DID WRONG, THE

4    SENTENCE THAT THE COURT IS GOING TO HAVE TO IMPOSE IS FAR IN

5    EXCESS OF WHAT REALLY IS FAIR AND APPROPRIATE.

6        AND I FEEL SORRY FOR THEM.  I WOULD HOPE THE COURT

7    WOULD BE AS LENIENT AS YOU CAN.

8        THE COURT:  THANK YOU, MR. FEIGE.  MS. ANDERSON, I'D

9    BE HAPPY TO HEAR FROM YOU.

10        MS. ANDERSON:  THANK YOU, YOUR HONOR.  MY CHILDREN

11    ASKED ME NOT TO SPEAK, BUT I CANNOT DO THAT.

12        WITH ALL DUE RESPECT TO THE COURT, MY NAME IS

13    WILHELMINA ANDERSON.  I HAVE BORNE FOUR CHILDREN.  THREE OF

14    THEM WERE STRIPPED FROM ME BY THIS COURT FOR A PARAPHERNALIA

15    CHARGE AND WAS GIVEN THE DEATH SENTENCE.  AND, WITH THAT,

16    THEY GAVE ME THE DEATH SENTENCE.

17        THE GOVERNMENT FEELS THAT I WILL SURVIVE.  I WILL

18    NOT SURVIVE, BUT I'M GOING TO FIGHT TO KEEP MY LIFE TO SEE MY

19    CHILDREN FREE.

20          I HAVE SPINAL STENOSIS, HEART ATTACK AND A LOT OF

21     DIFFERENT THINGS BUT I LEAVE THAT FOR MY PROBLEMS FOR ANOTHER

22     DAY.

23          MY PROBLEM IS HOW DID MR. SHEEHY AND THE OTHER

24     AGENTS PUT THIS CASE TOGETHER, WHY THEY SAID THAT MY SON HAD

25     PARAPHERNALIA IN THE STORE IN 1994.

32

1       WHO BROUGHT IT TO HIS STORE?  BECAUSE HE ONLY

2    BROUGHT IT IN THE COUNTRY SINCE 1997.

3       WHO BROUGHT IT TO HIS STORE IN 1994?  IS IT THE

4    MYSTERY MAN, WHITE MAN, BERNIE MYERS?

5       NO ONE WANTS TO TALK ABOUT BERNIE MYERS WHO HAS

6    BEEN IN THE SAME BUSINESS FOR OVER 13 YEARS, WHO HAS POOR

7    HEALTH.  THE GOVERNMENT STATED ON THIS -- IN THIS SAME

8    COURTROOM THE REASON WHY MR. MYERS WAS NOT BROUGHT TO
TRIAL

9    IS BECAUSE HE IS OLD, AND HE IS SICK.

10       I KNOW MR. MYERS VERY WELL.  HE ONLY HAD A GALL

11    BLADDER OPERATION.  I AM OLD AND I AM SICK, BUT YET I HAVE

12    BEEN CONVICTED.

13       I ACCUSE THE GOVERNMENT OF BEING PREJUDICED AND

14    BIASED AGAINST ME BECAUSE I AM A BLACK WOMAN.  I AM VERY SICK

15    TODAY.  AND I PRAY TO MY FATHER THAT I WILL MAKE IT THROUGH

16    TODAY.

17       BUT I AM NOT WORRIED ABOUT THAT.  LIKE I HAVE TO

18    FIGHT.  I NEVER RAN ANY STORES FOR MY SON.

19       ALL OF MY STORES WAS OWNED AND OPERATED SOLELY BY

20    ME. I WORK FOR NO MAN.

21        I HAVE BEEN WORKING SINCE 1961 AND I AM APPALLED

22    THAT THE GOVERNMENT WOULD THINK ME, A WOMAN OF MY
CHARACTER,

23    WOULD WORK FOR MY SON.

24        MENA T'S WAS MINE.  BAD BOYZ WAS MINE.  BAD BOYZ 2

25    WAS MINE.  FASHION FOCUS WAS MINE, AND THE SHOE STORES WAS

33

1   MINE.  THESE STORES THE GOVERNMENT KINDLY LEFT OFF THEIR

2   RECORD, BECAUSE THESE ARE CLOTHING STORES AND SHOE STORES.

3           NOW, I MUST BE A BEAUTIFUL MAGICIAN.  I CAN RUN

4   CHARLES STREET AND RUN ALL OF THOSE OTHER BUSINESSES THAT

5   BELONGS TO ME.  I AM A GOOD MAGICIAN.

6           OKAY.  THE FLEA MARKET ON PATAPSCO, ON THE

7   WEEKENDS, I STAYED THERE AND GOT RECEIPTS AND RECORDS, OKAY,

8   VIDEO GAME STORE ON MONUMENT STREET, I GOT RECEIPTS AND

9   RECORDS.  I AM REALLY A MAGICIAN.

10          THE BOOTH IN GOLDEN RING MALL BELONGS TO ME.  YES,

11  MY SON HAD A LOT OF DIFFERENT STORES, BUT NONE OF MINE.

12          I HAD MY OWN.  I CARRY MY OWN WEIGHT.  I DON'T

13  CARRY MY SON'S WEIGHT.

14          AND I WANT TO MAKE THIS CLEAR FOR THE RECORD, OKAY.

15  I AM NOT GOING TO SAY TOO MUCH BECAUSE I AM VERY -- FEELING

16  VERY BAD.

17          I HAD TO SIT HERE IN TOTAL PAIN AND TAKE MORPHINE,

18  THAT'S THE ^OXICON AND ^OXIDON, IN ORDER SO I CAN MOVE MY

19  BODY AND TO WALK.  THE JUDGE IS RIGHT, I CAN WALK, BECAUSE I

20  AM DRUGGED UP.  I CAN MOVE, BECAUSE I AM DRUGGED UP.

21          TAKE THE DRUGS FROM ME AND SEE WHERE I WILL BE.  ON

22     MY BACK SIDE, AND THE GOVERNMENT WILL BE CARRYING ME.

23          OKAY.  I ACCUSE THE GOVERNMENT OF VIOLATING MY

24     CONSTITUTIONAL RIGHTS.  I'VE GOT THE CONSTITUTION WITH ME.

25          IT SAID I AM SUPPOSED TO FACE ALL OF MY ACCUSERS.

34

1    I DIDN'T FACE OFFICER TONY BROWN WHO WORKED FOR MY SON JOHN

2    ANDERSON, FOR THE RECORD, AND IT'S ON THE RECORD THAT HE

3    WORKED SOMEWHERE.  OKAY.  I AM NOT GOING TO SAY AT THIS TIME.

4         I NEVER FACED DAVID LYNCH, MY ACCUSER.  I NEVER HAD

5    A FAIR JURY TRIAL, BECAUSE ONE OF THE JURORS SAID FRY US ALL,

6    WHY WASTE THE TAXPAYER'S MONEY.

7         I HOPE THAT MY MONEY I MADE FROM 1961 PAYING TAXES

8    UP TO THE TIME I GOT MY BUSINESS PAID FOR WAS TAXPAYER MONEY.

9    I LOVE MY GOVERNMENT.

10        I HAVE HIGH RESPECT FOR MY GOVERNMENT, BUT, YOU

11   KNOW, MY GOVERNMENT BELIEVES IN THE TRUTH.  I'VE GOT A LOT

12   MORE TO SAY, BUT I AM TIRED.

13        I JUST WANT TO PUT ALL OF MY OTHER STORES ON THE

14   RECORD AND I WANT THE GOVERNMENT TO TELL ME ONE MORE
THING.

15   I WENT TWO TIMES TO THE SHOW IN VEGAS TO BUY CLOTHES FOR MY

16   STORE, AND SPENT TIME OUT THERE, 2 OR 3 WEEKS.  I WANT TO

17   KNOW WHERE I HAVE TIME TO MANAGE ALL OF THESE OTHER

18   BUSINESSES.

19        I THANK YOU.  AND GOD BLESS YOU.

20          THE COURT:  THANK YOU, MS. ANDERSON.  COUNSEL, IS

21     THERE ANYTHING MORE THAT I SHOULD DO OR ANYTHING MORE THAT I

22     SHOULD DECIDE BEFORE I PRONOUNCE SENTENCE?

23          MR. CLARKE:  NO, YOUR HONOR.

24          MR. FEIGE:  NO, YOUR HONOR.

25          THE COURT:  THANK YOU.  MS. KERNAR?

35

1          MS. KERNAR:  YES, YOUR HONOR.

2          THE COURT:  AT THE OFFENSE LEVEL FOR THE MANDATORY

3    MINIMUM, THE NUMBER OF YEARS OF SUPERVISED RELEASE, IS IT

4    THREE, FOUR OR FIVE?

5          MS. KERNAR:  FIVE, YOUR HONOR.

6          THE COURT:  FIVE.  THANK YOU.  THE SENTENCE THAT I

7    WILL IMPOSE IS AS FOLLOWS:

8          THERE ARE TWO PRONGS WITH RESPECT TO COUNT ONE ON

9    WHICH MS. ANDERSON WAS CONVICTED.

10         THE FIRST IS A CONSPIRACY TO DISTRIBUTE DRUG

11   PARAPHERNALIA.  THE SENTENCE THAT I IMPOSE IS 24 MONTHS, AND

12   ONE YEAR OF SUPERVISED RELEASE.

13         THE 24 MONTHS TO RUN CONCURRENTLY WITH THE SENTENCE

14   ON THE OTHER PRONG OF COUNT ONE, AND THE ONE YEAR OF

15   SUPERVISED RELEASE ALSO TO RUN CONCURRENTLY WITH THE OTHER

16   TERM OF SUPERVISED RELEASE.

17         WITH RESPECT TO THE SECOND PRONG OF COUNT ONE, THAT

18   CHARGE IS CONSPIRACY TO AID AND ABET THE DISTRIBUTION OF

19   DRUGS.  BASED UPON THE CONVICTION, THERE IS A MANDATORY

20   MINIMUM SENTENCE OF 120 MONTHS, WHICH I HEREBY IMPOSE,

21     FOLLOWED BY A PERIOD OF FIVE YEARS OF SUPERVISED RELEASE.

22          THE 120 MONTHS AND THE PERIOD OF FIVE YEARS OF

23     SUPERVISED RELEASE TO RUN CONCURRENTLY WITH THE SENTENCE FOR

24     AIDING AND ABETTING -- EXCUSE ME -- FOR THE SENTENCE FOR THE

25     CONSPIRACY TO DISTRIBUTE DRUG PARAPHERNALIA.

36

1        I WILL NOT IMPOSE A FINE IN THE CASE.  I WILL,

2    HOWEVER, IMPOSE A ONE HUNDRED DOLLAR SPECIAL ASSESSMENT,

3    WHICH IS MANDATORY.

4        MR. FEIGE IS CORRECT THAT THIS IS A CASE THAT HAS

5    MANY ELEMENTS OF TRAGEDY.  HERE, YOU HAVE A FAMILY THAT

6    HAS -- WAS IN AN INTERRELATED FAMILY BUSINESS, THAT FAMILY

7    HAS ESSENTIALLY BEEN DESTROYED, IT WAS AN INTELLIGENT FAMILY,

8    ENTREPRENEURIAL, ATTEMPTING TO RUN BUSINESSES, TRYING TO

9    SUCCEED, BUT THE BUSINESSES THAT THEY PICKED WERE THE WRONG

10    BUSINESSES.

11        SELLING DRUG PARAPHERNALIA DIRECTLY DESIGNED TO AID

12    AND ABET THE DISTRIBUTION OF DRUGS, ENABLING VAST QUANTITIES

13    OF HEROIN, COCAINE AND CRACK COCAINE TO BE DISTRIBUTED HERE

14    IN BALTIMORE AND ELSEWHERE, THEREBY SACRIFICING OTHER

15    FAMILIES TO THEIR OWN VISION OF SUCCESS.

16        SO, ALTHOUGH THIS IS A VERY HIGH SENTENCE, IT IS A

17    TRAGEDY, THE SENTENCE IS, IN MY VIEW, MERITED BY THE CRIME

18    THAT WAS COMMITTED.

19        I WILL RECOMMEND TO THE BUREAU OF PRISONS THAT MS.

20    ANDERSON, BECAUSE OF HER ILL HEALTH, BE SENT TO WHATEVER

21    FACILITY, WOMEN'S FACILITY, IS BEST, BOTH FOR SCREENING HER

22    INITIALLY AND FOR DEALING WITH HER PHYSICAL CONDITION.

23        I ADVISE MS. ANDERSON OF HER RIGHT TO TAKE AN

24    APPEAL.  MR. FEIGE HAS JUST INDICATED THAT HE WILL BE FILING

25    AN APPEAL SHORTLY, CERTAINLY WITHIN THE REQUIRED PERIOD.

37

1    COUNSEL, IS THERE ANYTHING MORE THAT WE NEED TO ACCOMPLISH

2    THIS MORNING?

3        MR. CLARKE:  NO, YOUR HONOR.

4        MR. FEIGE:  YOUR HONOR, TWO ITEMS.  NUMBER ONE IS I

5    GUESS AT THE CONCLUSION OF THE PROCEEDINGS THERE IS A NOTICE

6    OF APPEAL SITTING ON THE COUNTER IN FRONT OF THE COURT CLERK

7    AND I WOULD ASK HER TO FILE IT UPON THE CONCLUSION OF THESE

8    PROCEEDINGS.

9        SECONDLY, YOUR HONOR, I WOULD ASK FOR PERMISSION

10    FOR HER TO REPORT TO THE INSTITUTION WHEN DESIGNATED BY THE

11    U.S. MARSHALS OR THE BUREAU OF PRISONS.

12        ALSO, IN THAT REGARD, I THINK MAYBE THE COURT SAID

13    IT, BUT MAYBE I DIDN'T HEAR IT, I JUST WANT TO MAKE SURE IT'S

14    IN THERE, THAT SHE BE RECOMMENDED --  THAT SHE BE SENT TO AN

15    INSTITUTION WHERE SHE SHOULD BE EVALUATED, I THINK YOU

16    REFERRED TO THAT EARLIER, THAT SHE BE EVALUATED FOR HER

17    MEDICAL PROBLEMS, AND RECEIVE APPROPRIATE MEDICAL CARE.

18        THE COURT:  NO, THAT WOULD BE --  I MADE THAT

19    SPECIFIC RECOMMENDATION.

20        LET ME ASK, ON SELF SURRENDER, DOES THE GOVERNMENT

21    OPPOSE SELF SURRENDER?

22        MR. CLARKE:  YOUR HONOR, THE COURT -- I MEAN

23    GOVERNMENT WOULD JUST NOTE THAT, AGAIN, THE CONVICTION

24    HAPPENED EIGHT MONTHS AGO, THE LAST SENTENCING HEARING WAS

25    FIVE MONTHS AGO, THE GOVERNMENT BELIEVES THAT MS. ANDERSON

38

1    HAS HAD A LOT OF TIME TO PREPARE FOR TODAY, AND I WOULD JUST

2    NOTE THAT FOR THE RECORD.

3        THE COURT:  WELL, IT SEEMS TO ME THAT, BECAUSE OF

4    HER MEDICAL CONDITION, THAT SHE SHOULD REPORT WHEN THERE IS A

5    FACILITY DESIGNATED TO RECEIVE HER AND DEAL WITH HER MEDICAL

6    CONDITION, SO I WILL SIGN --

7        (CLERK CONFERRING WITH THE COURT)

8        THE COURT:  WELL, WHAT I WILL DO IS SET A DATE,

9    WHICHEVER -- EITHER 30 DAYS OR WHENEVER DESIGNATED, WHICHEVER

10   COMES EARLIER.  GOOD.  THANK YOU.

11       MR. FEIGE:  YOUR HONOR, ONE OTHER MINOR THING, I

12   DON'T KNOW IF THE COURT CAN DO THIS CONSISTENT WITH SENDING

13   HER TO AN INSTITUTION THAT WILL GIVE HER GOOD MEDICAL CARE;

14   SHE WANTED TO KNOW IF THERE IS ANY WAY THE COURT COULD

15   RECOMMEND THAT SHE SERVE HER SENTENCE IN THE SAME INSTITUTION

16   AS HER DAUGHTER, RACHELLE, AND, AGAIN, I DON'T KNOW, IT'S

17   REALLY ULTIMATELY UP TO THE BUREAU OF PRISONS AND THERE MAY

18   BE A -- I TOLD HER THERE MAY BE A PROBLEM IF SHE IS SENT TO A

19    FACILITY THAT CAN GIVE HER BETTER MEDICAL TREATMENT AND

20    RACHELLE WOULDN'T NEED THAT KIND OF TREATMENT.

21        THE COURT:  WHY DON'T I DO THIS, BECAUSE I AM NOT

22    SURE WHAT THE BUREAU OF PRISONS' POLICIES ARE.  I WILL STATE

23    THAT THE -- MS. ANDERSON HAS EXPRESSED A STRONG DESIRE TO BE

24    PLACED WHERE HER DAUGHTER IS PLACED, AND, IF THIS DOES NOT

25    CONTRADICT ANY BUREAU OF PRISONS POLICY, THAT WOULD SEEM TO

39

1     ME TO BE A DESIRABLE THING AND I WOULD RECOMMEND IT.

2           MR. FEIGE:  THANK YOU, YOUR HONOR.

3           THE COURT:  THANK YOU.

4           THE CLERK:  ALL RISE.  THIS HONORABLE COURT NOW

5     STANDS IN RECESS.

6           (THEREUPON, COURT STOOD ADJOURNED IN THIS CASE)

7

8

9

10

11

12

13

14

15

16

17

18

19

20           REPORTER'S CERTIFICATE

21

22         I. E. EDWARD RICHARDSON, OFFICIAL COURT REPORTER

23   FOR THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF

24   MARYLAND, APPOINTED PURSUANT TO THE PROVISIONS OF TITLE 18,

25   UNITED STATES CODE, SECTION 753, DO HEREBY CERTIFY THAT THE

40

1    AFOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF THE

2    PROCEEDINGS IN THE AFOREMENTIONED AND NUMBERED CASE ON THE

3    DATE HEREIN BEFORE SET FORTH, AND I DO FURTHER CERTIFY THAT

4    THE FOREGOING TRANSCRIPT HAS BEEN PREPARED BY ME OR UNDER MY

5    SUPERVISION.

6

7

8

9

10

11          _____

12          E. EDWARD RICHARDSON

13          OFFICIAL COURT REPORTER

14          UNITED STATES DISTRICT COURT

15          3012 UNITED STATES COURTHOUSE

16          101 WEST LOMBARD STREET

17          BALTIMORE, MARYLAND 21201

18          (410) 539-0034

19

20

21

22

23

24

25